**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| DOUGLAS MCGREW, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 3:23-CV-2171-MAB** |
| | ) |
| DENNIS LARSON, | ) |
| | ) |
| **Defendant.** | ) |

**<u>MEMORANDUM AND ORDER</u>**

**BEATTY, Magistrate Judge:**

Plaintiff Douglas McGrew filed suit in June 2023 pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights at Big Muddy River Correctional Center (Doc. 1). The Court dismissed the original complaint as insufficient to state a claim (Doc. 13), and Plaintiff filed a timely amended complaint in November 2023 (Doc. 14). Following a threshold review of the amended complaint, Plaintiff was permitted to proceed on an Eighth Amendment deliberate indifference claim against Dr. Dennis Larson based on the delay in treatment for a respiratory issue (Doc. 15).

Dr. Larson filed a motion for summary judgment on April 21, 2025 (Doc. 48; *see also* Docs. 49, 50). Plaintiff did not file a response. He did, however, file his own motion for summary judgment on April 30, 2025 (Doc. 51). Defendant Larson filed a response in opposition (Doc. 52), to which Plaintiff filed a reply (Doc. 53). Defendant Larson then filed a motion to strike Plaintiff's reply brief because it lists twelve new facts that were not included in Plaintiff's motion for summary judgment (Doc. 54). Once again, rather than filing a response, Plaintiff instead filed his own motion, a "Motion to NOT Strike" (Doc. 55). All of these motions are now before the Court.

<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

As an initial matter, the Court must discuss the timing of Plaintiff's motion for summary judgment. The deadline for filing motions for summary judgment was April 28, 2025 (Doc. 36). Plaintiff's motion was

filed on April 30, 2025 (Doc. 51)—two days late. Furthermore, it is apparent that Plaintiff did not submit his motion to be filed before the deadline but it was delayed in reaching the Court for reasons beyond his control. *See, e.g., See Taylor v. Brown,* 787 F.3d 851, 858–59 (7th Cir. 2015) (under "mailbox rule," prisoner submission is deemed filed with court when he gives submission to prison officials for mailing); *see also Ray v. Clements*, 700 F.3d 993, 1002–03 (7th Cir. 2012) (explaining purpose of the mailbox rule). Rather, both the motion and Plaintiff's declaration attached to the motion are dated April 29, 2025 (*see* Doc. 51, pp. 3, 15, 19), which is the day *after* motions for summary judgment were due. The Court thus finds Plaintiff's motion for summary judgment untimely and orders it stricken. However, to the extent that the contents of Plaintiff's motion can be considered a response in opposition to Dr. Larson's motion for summary judgment, the Court will construe it as such. Additionally, striking Plaintiff's motion for summary judgment renders Dr. Larson's motion to strike (Doc. 54) and Plaintiff's "Motion to NOT strike" (Doc. 55) both moot.

### DEFENDANT LARSON'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view all the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is warranted. *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (citation omitted). *See also Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) ("Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law.") (citation and internal quotation marks omitted).

### FACTS

The facts presented here are essentially undisputed by the parties (*see* Doc. 49, pp. 1–6; Doc. 51, pp. 5–7, 16–19; Doc. 52, pp. 2–6), except where indicated.

Plaintiff Douglas McGrew was incarcerated at Big Muddy River Correctional Center during the events underlying this lawsuit and remains incarcerated there today. Defendant Dennis Larson has been the Medical Director at Big Muddy since September 2011 (Doc. 49-4, para. 2 (Larson Decl.)).

Plaintiff had covid in January 2022 (*see, e.g.,* Doc. 49-3, p. 8). On February 10, 2022, Plaintiff was seen by a nurse at 4:30 p.m. for complaints of shortness of breath that Plaintiff said had been ongoing for three days (Doc. 49-3, pp. 6–7). Plaintiff also reported coughing, wheezing, and that laying down made his breathing worse (*Id.*). The nurse noted that Plaintiff had a history of asthma and had been using an inhaler since 2019 (*Id.*). The nurse took Plaintiff's vitals and noted audible wheezing and coarse lung sounds, but Plaintiff did not appear to be in respiratory distress (*Id.*). The nurse immediately contacted Dr. Larson (*Id.*). Dr. Larson ordered a Covid test, which came back negative (*Id.*). Dr. Larson also ordered a three-day prescription of Prednisone and a three-day medical lay in (*Id.*; Doc. 49-4, para. 5 (Larson Decl.)). Prednisone is a steroid medication that is used to reduce inflammation and swelling in the lungs (Doc. 49-4, para. 6). A medical lay-in is a period of restricted activity or confinement due to illness or injury, often for inmates in correctional facilities (Doc. 49-4, para. 7).

Dr. Larson followed-up with Plaintiff six days later on February 17, 2022 (Doc. 49-3, p. 8). Plaintiff was still coughing (*Id.*). But on examination, Plaintiff's chest was clear and his vital signs were within normal limits (*Id.*; Doc. 49-4, para. 8). Dr. Larson ordered: (1) a complete blood count test to assess overall health and screen for conditions that affect the lungs, like anemia, infections, and cancer; (2) B-type natriuretic peptide test to test for signs of heart failure; (3) erythrocyte sedimentation rate test to screen for inflammatory activity in the body; and (4) a chest x-ray, which is used to detect cancer and infection in the lungs (Doc. 49-3, p. 8; Doc. 49-4, para. 8–12). Dr. Larson also ordered a five-day prescription of Prednisone and a return visit to the healthcare unit in one week (Doc. 49-3, p. 8; Doc. 49-4, para. 8).

On February 22, 2022, Plaintiff refused his prescription of Prednisone (Doc. 49-3, p. 23; Doc. 49-4, para. 13). Plaintiff asserts that he was unfamiliar with Prednisone and opted to stop taking it because he

was unsure how it would interact with his mental health medications because Dr. Larson did not answer his questions about the side effects (Doc. 51, pp. 17, 18).

On March 11, 2022, Plaintiff underwent a chest x-ray, and the radiologist noted increased density of the right upper lobe, which according to Dr. Larson, meant "the probable presence of a soft tissue lesion" (Doc. 49-3, p. 5; Doc. 49-4, para. 14). The radiologist recommended a CT scan of the chest for further evaluation (Doc. 49-3, p. 5; Doc. 49-4, para. 14). It appears that Dr. Larson did not review the x-ray results until April 11, 2022 (*see* Doc. 49-3, p. 5), and that day he submitted a referral for Plaintiff to get a chest CT scan (Doc. 49-3, p. 10; Doc. 49-4, para. 16). There is no indication in the record before the Court as to when the referral was approved or when the appointment for the CT scan was made (*see* Doc. 49-3).

Plaintiff did not undergo the CT scan until July 29, 2022, and it showed a 3 x 2.5cm mass, which the radiologist said was a "presumed bronchogenic carcinoma" (Doc. 49-3, p. 11; Doc. 49-4, para. 17). In other words, lung cancer (Doc. 49-4, para. 21). The radiologist recommended a PET scan for further evaluation (Doc. 49-3, p. 11), and Dr. Larson submitted a referral that same day for a PET scan and a thoracic surgery consultation (Doc. 49-3, pp. 12). There is no indication in the record before the Court as to when the referral was approved or when the appointment for the CT scan was made (*see* Doc. 49-3). On September 6, 2022, Dr. Larson met with Plaintiff to discuss the findings of his chest CT (Doc. 49-3, p. 9; Doc. 49-4, para. 20). Dr. Larson explained that the scan referenced bronchogenic carcinoma and that Plaintiff was being referred for a PET scan (Doc. 49-4, para. 20).

Plaintiff underwent the PET scan on September 23, 2022, which revealed the mass-like density in his right lung was "less prominent," according to Dr. Larson (Doc. 49-4, para. 22; *see also* Doc. 49-3, pp. 13–14 (PET scan report); *id.* at p. 15 ("PET . . . demonstrated less density and a low SUV"); *id.* at p. 17 (PET showed "seeming improvement in appearance of the lesion")).

On October 12, 2022, Plaintiff saw Dr. Joseph Platz, a thoracic surgeon (Doc. 49-3, pp. 15–17). Dr. Platz noted that Plaintiff had covid earlier in the year but was now asymptomatic (*Id.* at p. 15). Dr. Platz indicated that malignancy "is of concern" but Plaintiff's age (32 years old) and the lesion's seeming improvement in appearance seemed to weigh against a cancer diagnosis (*Id.* at p. 17). Given the lack of

clear etiology or diagnosis, Dr. Platz recommended either short-term imaging surveillance or a biopsy (*Id.*). Plaintiff opted for the biopsy (*Id.*). Dr. Platz ordered a biopsy and a follow-up visit in one month (*Id.*). Dr. Larson submitted a referral that same day for the biopsy (Doc. 49-3, p. 18; Doc. 49-4, para. 25).

Plaintiff presented for the biopsy on October 26, 2022 (Doc. 49-3, pp. 19–21). However, the biopsy was deferred because Dr. Platz saw that the lesion appeared slightly smaller and there was "minimal metabolic activity" on the recent scans, "making malignancy less likely" (*Id.* at pp. 19, 21; Doc. 49-5, p. 7). Dr. Platz discussed the situation with Plaintiff and that surveillance imaging was a reasonable option (Doc. 49-3, p. 21). Dr. Platz ordered a CT scan in two to three months, with a "suggested date of . . . on or about January 14, 2023," and a follow-up appointment with him "shortly after" (*Id.*; Doc. 49-5, p. 7). Dr. Larson submitted a referral for a follow-up visit with Dr. Platz (Doc. 49-4, para. 28).[1]

Plaintiff underwent a follow-up CT scan on January 16, 2023, as recommended (Doc. 49-5, p. 8). The radiologist noted "significant interval improvement" and that the lesion had shrank from 3 x 2.5cm to 1.5 x 1.3cm (*Id.*). Plaintiff then saw Dr. Platz on February 8, 2023 (Doc. 49-5, pp. 1–3). Dr. Platz noted that Plaintiff was "generally doing quite well" and the lesion was continuing to shrink in size (*Id.* at pp. 1, 3). Dr. Platz ordered repeat imaging in six months (*Id.* at p. 3).

Plaintiff underwent additional CT scans in July 2023 (Doc. 49-5, p. 9) and January 2024 (*see* Doc. 49-5, p. 6). Each time, Dr. Platz noted that the lesion appeared stable (Doc. 49-3, pp. 2–3; Doc. 49-5, p. 6). Dr. Platz extended the imaging surveillance to one year (Doc. 49-5, p. 6). According to Plaintiff, Dr. Platz told him in early 2025 that there was no reason to continue monitoring the right lung nodule as it was not cancerous (Doc. 49-1, pp. 52–53).

## DISCUSSION

To prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must prove that prison officials acted with "subjective deliberate indifference" to his "objectively serious" health condition.

---

[1] Dr. Larson asserted in his declaration that he submitted the referral on November 21, 2022, for a follow-up visit with Dr. Platz (Doc. 49-4, para. 28). The page of the medical records that Dr. Larson cited , however, is not in the record before the Court (Doc. 49-4, para. 28 (citing MCGREW BMRCC MED 584); *see* Doc. 49-3; Doc. 49-5).

*E.g., Reck v. Wexford Health Sources, Inc.,* 27 F.4th 473, 483 (7th Cir. 2022). For the purposes of summary judgment, Defendant Larson does not dispute that the mass on Plaintiff's head was an objectively serious medical condition (*see* Doc. 49). Therefore, the only question for the Court is whether the evidence, when viewed in a light most favorable to Plaintiff, establishes an issue of fact as to whether Defendant Larson acted with deliberate indifference

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The deliberate indifference standard is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted). *See also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) ("[M]ere negligence is not enough."). It requires a showing of something approaching "intentional wrongdoing" or "a total unconcern for the prisoner's welfare in the face of serious risks." *Holloway*, 700 F.3d at 1073; *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).

When it comes to medical professionals, "[t]here is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). For that reason, a medical professional is entitled to deference in treatment decisions so long as they are based on professional judgment, meaning the decision was "fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). A plaintiff can establish deliberate indifference by showing medical professional's decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.'" *Petties*, 836 F.3d at 729 (citation omitted). *See also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'").

A plaintiff can also establish deliberate indifference by showing an "'inexplicable delay' in responding to an inmate's serious medical condition[.]" *Goodlow v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citing *Petties*, 836 F.3d at 731). "It is not enough, however, simply to point to a delay, which may or may not reflect deliberate indifference." *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021). The delay in providing treatment is only actionable under the Eighth Amendment if the plaintiff can provide "certifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) (alteration in original). *Accord Petties*, 836 F.3d at 730–31 ("To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain."). "That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams*, 491 F.3d at 715.

Here, Plaintiff contends that Dr. Larson exhibited deliberate indifference with regard to the manner in which he initially treated Plaintiff and due to the delay in treatment that Plaintiff experienced (*see* Doc. 14; Doc. 15; Doc. 51).

With respect to the initial treatment, Dr. Larson ordered a short course of prednisone and a medical lay-in permit. Plaintiff seems to think the prednisone was an inappropriate treatment, and he should have been given an albuterol inhaler instead (Doc. 51, pp. 11–14, 19). For example, Plaintiff asserts that prednisone is used to reduce inflammation and there is no evidence that his lungs were swollen (*e.g., id.* at pp. 14, 17). Plaintiff also seems to think that the alleged inadequate treatment for his respiratory issue caused strain on his lungs, which caused the mass to grow (*Id.* at p. 14).

Plaintiff's argument and evidence is not enough for a reasonable jury to conclude that Dr. Larson exhibited deliberate indifference with the initial treatment he ordered. Contrary to Plaintiff's assertion, there *is* evidence of inflammation. He had a documented history of asthma (Doc. 49-3, pp. 6–7), which is a chronic inflammatory condition in which an individual's airways narrow and swell.[2] And Plaintiff had

---

[2]    MAYO CLINIC, *Asthma*, https://www.mayoclinic.org/diseases-conditions/asthma/symptoms-causes/syc-20369653 [https://perma.cc/P4QP-QXET] (last visited March 23, 2026).

audible wheezing on physical examination (Doc. 49-3, pp. 6–7), which is the sound made when an individual's airway is partially blocked due to irritation or inflammation.[3]

Furthermore, Dr. Larson intimated that prednisone was an appropriate treatment for Plaintiff's symptoms (*see* Doc. 49-4). Numerous medical sources suggest the same.[4] Plaintiff has not provided any medical evidence to the contrary (*see* Doc. 51). Nor has Plaintiff provided any medical evidence to support his contention that Dr. Larson's course of treatment is what caused the lesion to develop in his lung (*see* Doc. 51).[5] To the extent that Plaintiff was unfamiliar with prednisone and Dr. Larson failed to answer his questions about the medication, that is truly unfortunate. But under the circumstances here, this cannot amount to deliberate indifference.

As for the delay in obtaining care, Dr. Larson's only argument is that Plaintiff has no evidence to

---

[3] MAYO CLINIC, *Wheezing – Symptoms*, https://www.mayoclinic.org/symptoms/wheezing/basics/causes/sym-20050764 [https://perma.cc/S2J8-NAJ2] (last visited March 23, 2026).

[4] *See, e.g.,* ASTHMA AND ALLERGY FOUNDATION OF AMERICA, *Oral Corticosteroids,* https://aafa.org/asthma/asthma-treatment/asthma-treatment-oral-corticosteroids-prednisone/ [https://perma.cc/XY67-G39G] (last visited March 23, 2026) ("Oral corticosteroids (OCS)" including prednisone, "are a common treatment for acute asthma flare-ups to reduce inflammation and swelling in the airways."); Evan L. Dvorin, MD and Mark H. Ebell, MD, MS, *Short-Term Systemic Corticosteroids: Appropriate Use in Primary Care,* 101 AM FAM PHYSICIAN 89, 90 (Jan. 15, 2020) ("Short-term systemic corticosteroids . . . may be appropriate for bronchitis associated with asthma"); MOUNT SINAI, *Three Things you May Not Know About Asthma*, https://health.mountsinai.org/blog/three-things-you-may-not-know-about-asthma/#:~:text=Albuterol%20does%20not%20treat%20inflammation,worsening%20of%20asthma%20over%20time [https://perma.cc/M5BE-KFEQ] (last visited March 23, 2026) ("Albuterol is a medication delivered by an inhaler that helps to open airways when you have an asthma attack by relaxing the muscles. . . . Albuterol does not treat inflammation and only provides quick relief without treating the underlying cause of asthma.").

[5] *But see* Zemin He, et al, *Analysis of screen-detected pulmonary nodules before and after the novel coronavirus epidemic: a multicenter retrospective cohort study*, FRONTIERS IN ONCOLOGY, April 2025, at 2, 3, 5, 6, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC11996628/ (medical study explaining that Covid-19 can cause pulmonary nodules and masses that present similar to those of early lung cancer patients); Amita Sharma, M.D., *Case 25-2020: A 47-Year-Old Woman with a Lung Mass*, 383 N. ENGL. J. MED. 665 (2020) ("[T]he the radiographic features of Covid-19 can be quite variable" but "[f]or patients who have one or a few peripheral opacities that are nodular of masslike, cancer is included in the differential diagnosis"); CITY OF HOPE, *Lung Nodules,* https://www.cityofhope.org/clinical-program/lung-cancer/facts/lung-nodules (last visited March 23, 2026) ("Patients diagnosed with a COVID-19 infection may develop lung nodules . . . . In a small percentage of COVID-19 patients, nodules have been shown to look abnormal or atypical.").

support his contention that Dr. Larson delayed treatment, only his own "inadmissible beliefs" (*Id.* at p. 9). Dr. Larson's argument completely misses the mark. The delay is readily apparent from the face of the medical records. It took a month for Plaintiff to undergo the chest x-ray that Dr. Larson ordered, even though it appears that the x-ray was done in-house at Big Muddy (*see* Doc. 49-3, p. 5; Doc. 51, p. 18). It took Dr. Larson a full month to even review the x-ray. That report showed a "*probable*" lesion, yet it took 3.5 months for Plaintiff to get a CT scan. That CT scan showed "*presumed*" cancer, yet it took Dr. Larson almost six weeks to communicate the results to Plaintiff, another 2.5 weeks for Plaintiff to get a PET scan, and almost three more weeks to see the specialist. In other words, over two months went by with no action for "presumed" cancer. The delay is beyond the pale and "so obviously wrong" in the face of a serious risk of lung cancer that a layperson can draw the inference that it amounted to "a substantial departure from accepted medical judgment" without having to be told by an expert. *Feazell v. Wexford Health Sources, Inc.*, 140 F.4th 438, 442 (7th Cir. 2025) (quoting *Whiting*, 839 F.3d at 663).

The question then becomes whether Plaintiff suffered any harm as a result of the delay. *See Williams*, 491 F.3d at 714–15. This requirement is Dr. Larson's saving grace as Plaintiff has not provided any evidence that the months-long delay in obtaining diagnostic imaging and seeing a specialist caused him any harm that could have been avoided had that care been obtained sooner (*see* Doc. 51). There is no indication that Plaintiff suffered any kind of pain, prolonged and unnecessary symptoms, or that his condition worsened. *See, e.g., Perez v. Fenoglio,* 792 F.3d 768, 778 (7th Cir. 2015) (unexplained delays could support a finding of deliberate indifference where plaintiff had "gaping wound" and "open dislocation" of his thumb but had to wait five days for initial appointment with specialist and then additional seven months for follow-up appointment despite his repeated complaints to prison physician about ongoing pain and discomfort, bleeding, swelling, and loss of functioning); *Williams*, 491 F.3d at 716 (six-hour delay actionable where medical records showed it unnecessarily prolonged plaintiff's pain and high blood pressure); *Gil v. Reed,* 381 F.3d 649, 662 (7th Cir.2004) (recognizing that "hours of needless suffering" can constitute harm). To the contrary, the evidence shows that Plaintiff's symptoms resolved on their own and the mass in Plaintiff's lung actually improved over time, rather than got worse.

Ultimately, no reasonable jury could find in Plaintiff's favor because, despite the indisputable evidence that Dr. Larson slow-walked the diagnostic process, Plaintiff's condition turned out not to be cancer and there is no evidence that the delay ultimately caused any harm to Plaintiff.

### CONCLUSION

Plaintiff's motion for summary judgment (Doc. 51) is **STRICKEN** as it was untimely filed. Defendant Larson's motion to strike (Doc. 54) and Plaintiff's "Motion to NOT strike" (Doc. 55) are **MOOT**.

Defendant Larson's motion for summary judgment (Doc. 48) is **GRANTED**. Plaintiff's claim against Larson is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Larson and to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: March 27, 2026**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**